RAYMOND WAYNE HALLOCK *et al.*, Plaintiffs-Appellants, v. ROBERT W. WEAR *et al.*, Defendants-Appellees.

Fourth District   No. 4—89—0361

Opinion filed February 22, 1990.—Rehearing denied April 4, 1990.

Thomas H. Piper and L.K. Hubbard, both of White Hall, for appellants.

Rammelkamp, Bradney, Dahman, Kuster, Keaton & Fritsche, P.C., of Jacksonville, and James W. Day, of Carrollton (Forrest G. Keaton, of counsel), for appellees.

JUSTICE McCULLOUGH delivered the opinion of the court:

Plaintiffs Raymond Wayne Hallock and Freda E. Hallock brought an action against the defendants Robert W. Wear and James R. Wear, seeking a declaratory judgment for an easement by implication on defendants' property and damages for its destruction by defendants. Defendants filed a third-party action against Lillian E. Hamilton and Sterling M. Shafer, executors of the estate of Nellie Pearl Shafer (hereinafter estate), the previous owner of the parcels now owned by plaintiffs and defendants. Following a bench trial on count I, the trial court entered judgment for the defendants, finding plaintiffs failed to prove an easement by implication was intended by the estate. Plaintiffs appeal the judgment entered for defendants on count I, and allege the trial court erred (1) in finding an easement for water would be highly convenient and beneficial but not necessary, and (2) in considering the intent of the estate as expressed after the sale of the property to plaintiffs and defendants. Defendants filed a motion in this court to dismiss this appeal, alleging this court lacks jurisdiction to hear the appeal. This motion was ordered taken with the case. For the reasons that follow, we affirm the trial court.

Plaintiffs and defendants are owners of two parcels of land in Greene County, Illinois. Both parcels were formerly owned by Nellie Shafer, who died in 1984. The executors of her estate, Sterling Shafer and Lillian Hamilton, sold the parcels to plaintiffs and defendants at public auction on February 1, 1985. The notice of auction sale stated the parcels were offered for sale "subject to all private and public roadways and easements." Plaintiffs acquired the parcel situated to the east of defendants' parcel. The parcels are separated by a road known as Bluff Blacktop Road. Defendants' parcel (west) is mostly flat and contains a silo and a "sandpoint." Plaintiffs' parcel (east) has a hilly terrain and includes a residence.

On October 4, 1985, plaintiffs filed a three-count complaint against defendants, seeking a declaratory judgment and damages. Plaintiffs alleged that at the time of the sale and for 25 years prior thereto, a sandpoint with a pressure tank, pump and motor was situated on a portion of defendants' property; that an underground waterline, along with electrical connections, extended from defendants'

property beneath the road dividing the two tracts and was attached to a water hydrant and other water outlets on plaintiffs' property; and the sandpoint and related equipment had, for many years prior to the sale, provided a source of water for plaintiffs' parcel. Plaintiffs alleged defendants knew, at the time of the sale, or immediately subsequent thereto, that the sandpoint provided a source and supply of water for plaintiffs' parcel. Plaintiffs further alleged defendants removed the sandpoint, pump, and electrical connections subsequent to the sale without plaintiffs' approval or consent. In count I, plaintiffs requested a declaratory judgment that they acquired an easement by implication on defendants' parcel at the time of the sale, and that defendants be required to replace the sandpoint and all equipment removed after the sale. In count II, plaintiffs requested $10,000 in compensatory damages. In count III, plaintiffs requested $10,000 in punitive damages.

Sterling Shafer testified in a discovery deposition and at trial. Shafer owned both parcels from 1948 until 1952, when he sold the parcels to his parents. While Shafer owned the parcels, he put a sandpoint in on the west parcel to wet down a silo on the west parcel. Shafer testified at trial that a waterline from the sandpoint to the east parcel was installed after he sold the parcels to his parents. Shafer had earlier testified in his deposition that he installed the waterline from the sandpoint to the hydrants on the east parcel. Shafer stated there were a well and springs on the east parcel which adequately supplied water for the east parcel. Shafer stated he did not mention the sandpoint and its tie to the east parcel to the plaintiffs, defendants, or auctioneer prior to the sale on February 1, 1985. Shafer stated the waterlines running from the sandpoint to the east parcel were "strictly for standby" and the sandpoint was never used to supply water for the east parcel while he lived there from 1948 to 1952.

Lillian Hamilton also testified in a discovery deposition that she never discussed the sandpoint with the plaintiffs or defendants prior to the sale. She stated she did not remember discussing the sandpoint at the first closing on March 19, 1985. Hamilton further testified the springs in the hills on the east side provided plenty of water for the cattle her husband raised on the east parcel in the 1950's.

Hugh Strickland, attorney for the estate, testified at trial he was unaware of the sandpoint at the time the advertisement for the auction sale was prepared. The advertisement did not indicate the east parcel would receive water from the west parcel. Strickland stated the estate's intent regarding the water from the sandpoint was raised for the first time at the closing on defendants' parcel on March 19,

1985. Strickland testified defendants asked about the sandpoint on March 19, and he responded his title search did not reveal any easements of record.

The defendants testified as adverse witnesses for the plaintiffs. Defendants testified that because the electrical lines running from the pump over the sandpoint to the east parcel were noticeable, no discussion of the sandpoint was raised at the auction. Robert Wear testified he and his brother James were told two weeks prior to the sale that whoever bought the east parcel had to make arrangements for water. Both Robert and James Wear testified they did not speak to the executors of the estate prior to the sale. James Wear stated he talked to Robert Shafer, brother of the executors, about the sandpoint prior to the sale.

James Wear testified the plaintiffs telephoned him regarding the sandpoint after the sale and prior to the closing on March 19, 1985. James testified he told plaintiffs the issue would be discussed at the closing. James stated the sandpoint issue was discussed for the first time at the March 19 closing for defendants' parcel. Plaintiffs were not present at this closing. James stated the sandpoint was removed within one week following the March 19 closing, after Strickland and Sterling Shafer told defendants there was no easement of record for water to the east parcel. James Wear testified Sterling Shafer told him there was plenty of water on the east parcel and, therefore, he could pull out the sandpoint. James also testified the electrical poles supporting the electricity for the pump over the sandpoint were removed prior to the sandpoint's removal.

Helen R. Martin, former wife of Sterling Shafer, testified she and Shafer purchased both parcels at the same time in 1948 and lived in the house on the east parcel from 1948 to 1953. Martin testified because there was not enough water for the house on the east parcel during this time, a sandpoint was installed in 1950 on the west parcel. After the sandpoint was installed, Martin testified there was plenty of water for everything, the house and livestock. Prior to the installation of the sandpoint, Martin testified the spring west of the house on the east parcel dried up. After the sandpoint was installed, hydrants were installed on the east parcel.

Robert Wear, Sr., testified he participated with his sons in the bidding at the auction for the west parcel. He testified water rights for the east parcel were mentioned for the first time one week before the closing on March 19, 1985. He testified the pump for the sandpoint was taken out on February 12, 1985, the day Robert Shafer sold some of his equipment on the west parcel. Robert Shafer lived on the west

parcel from 1961 to 1985. The electricity for the pump on the sand-point came from the house on the east parcel. Robert Wear, Sr., also stated Strickland told the defendants they did not have to supply water for the plaintiffs' parcel. He also stated plaintiffs complained to him that they could not get any water at their house for their cows.

Wayne Hallock testified defendant Robert Wear told him after the equipment sale on February 12, 1985, that he (Robert Wear) would remove the sandpoint in two to three years and then Hallock would have to find another source of water. At that time, Hallock testified Robert Wear did not mention he had already removed the pump for the sandpoint. Hallock tested his water supply on the east parcel, which comes from a spring, and determined the pump generates about 60 gallons of water per hour. He stated the pump stops once or twice when it is pumping continuously. In the space of 4½ to 5 hours, Hallock was able to pump 250 gallons into a 1,000-gallon tank. Hallock reported that due to the pump stopping and starting, when using the shower in the house, "you could get scalded with hot water."

Hallock testified that, other than the spring, he occasionally gets some water from a stream after it has rained. Hallock stated he trucked in water for the 10 to 15 head of cattle he raised instead of using the pump at the house because, when using the house water, he could not water the cattle all at once. Hallock stated he did not raise the sandpoint issue at the auction because he presumed there would be plenty of water for the east parcel with the spring and the sandpoint. Hallock stated his pump in the basement of the house on the east parcel is connected to the hydrant at the cattle pen on his parcel and to the waterline running east to the sandpoint. Hallock further testified the sandpoint line is a source of drinking water for his house.

Robert Shafer testified water from the east parcel is supplied by springs. He stated the sandpoint was used for livestock, but never for the house because that water was not fit for human consumption. He stated he raised 50 to 60 head of cattle while he lived on the property from 1961 to 1985. He also stated the springs on the east parcel were sufficient to supply water for the cattle. One spring is located behind the house and two other springs are located in the bluffs behind the house. The cattle drink from the spring bluffs when pasturing there and get water from the sandpoint when pasturing near the house. Robert Shafer testified he and his parents tried to pump the spring dry in 1953 but could not. He had not checked the spring since then because there had not been a problem in getting enough water for the east parcel.

Robert Shafer testified his cattle pastured on the west parcel in

the winter and it was then when the sandpoint was used for the livestock. Robert Shafer testified he talked to the plaintiffs and defendants before the sale on February 12, and told all of them that whoever bought the east parcel would have to make arrangements to use the sandpoint water. Robert Shafer also told plaintiffs they really did not need water from the sandpoint. He also testified the sandpoint pipe had been replaced several times since it was first installed in 1950.

The deeds for plaintiffs' and defendants' parcels included general language for easements of record, but made no mention of the sandpoint or water rights for the east parcel.

On August 5, 1988, the trial court entered judgment for the defendants on count I. Plaintiffs' post-trial motion was denied on March 31, 1989. On May 23, 1989, the trial court amended its March 31 order *nunc pro tunc* to include findings under Supreme Court Rule 304(a) (107 Ill. 2d R. 304(a)).

We first address defendant's motion to dismiss this appeal. Defendants maintain this court is without jurisdiction to hear the appeal for lack of a final and appealable order. Defendants argue the March 31, 1989, order was not final and not appealable because no Rule 304(a) findings were then entered. Defendants argue Supreme Court Rule 304(a) applies to this case because plaintiffs sought multiple claims for relief and the March 31, 1989, order concerned only one claim and left open motions and a third-party complaint in the trial court. Defendants contend the trial court's actions on May 23, 1989, to amend the March 31, 1989, order *nunc pro tunc* were ineffective to provide this court with jurisdiction over this appeal filed April 28, 1989.

Plaintiffs argue this is not a Rule 304 case because the July 1988 and March 1989 decisions were final and appealable when entered. Alternatively, plaintiffs contend that the trial court's *nunc pro tunc* action on May 23, 1989, corrected any mistake or omission in the March 31, 1989, order and, thus, this appeal is properly before this court.

██ ▌Supreme Court Rule 304 governs appeals in cases involving multiple parties or claims for relief. It provides:

"If multiple parties or multiple claims for relief are involved in an action, an appeal may be taken from a final judgment as to one or more but fewer than all the parties or claims only if the trial court has made an express written finding that there is no just reason for delaying enforcement or appeal. Such a finding may be made at the time of the entry of the judgment

or thereafter on the court's own motion or on motion of any party. The time for filing the notice of appeal shall run from the entry of the required finding. In the absence of such a finding, any judgment that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties is not enforceable or appealable and is subject to revision at any time before the entry of a judgment adjudicating all the claims, rights, and liabilities of all the parties." (107 Ill. 2d R. 304(a).)

A "claim" for Supreme Court Rule 304(a) purposes has been defined as a matter involved in the action which determines a possible right of one party or liability of the other. (*Hise v. Hull* (1983), 116 Ill. App. 3d 681, 452 N.E.2d 372.) The supreme court has held that Rule 304(a) findings are not necessary in cases involving multiple claims where a claim is severed from other claims and tried separately. (*Carter v. Chicago & Illinois Midland Ry. Co.* (1988), 119 Ill. 2d 296, 518 N.E.2d 1031.) In *Carter*, the court stressed severance, for purposes of determining whether Rule 304(a) findings are required before an appeal may be taken, should be accomplished under section 2—1006 of the Civil Practice Law (Ill. Rev. Stat. 1987, ch. 110, par. 2—1006).

The supreme court stated:

"The use of Rule 304(a) certification shall be the rule in cases involving judgments as to fewer than all parties *or* claims. The perfecting of an appeal under Rule 303(a)(1) in such cases must be the exception." (Emphasis added.) *Carter*, 119 Ill. 2d at 308, 518 N.E.2d at 1037.

A judgment as to a separately tried issue is not appealable "unless the trial court, in its severance order, clearly and unequivocally states that the claim, counterclaim or the party has indeed been *severed*." (Emphasis in original.) *Carter*, 119 Ill. 2d at 307-08, 518 N.E.2d at 1037.

Plaintiffs contend there was only one claim upon which their action was based and the ruling on count I is final because it terminates the litigation between these parties.

The matters pending in the trial court in this case involve (1) plaintiffs' claim for damages from defendants for destruction of the easement (counts II and III); (2) plaintiffs' claim for costs (counts II and III); and (3) a third-party action wherein defendants seek (a) indemnification from the estate for any damages defendants must pay to plaintiffs, (b) reimbursement for attorney fees and costs expended by defendants in defending plaintiffs' action, and (c) rescission of the sale.

Defendants' third-party action seeking attorney fees and rescis-

sion claims concern the defendants' own losses and cannot be contained in a third-party action. (*Scott & Fetzer Co. v. Montgomery Ward & Co.* (1984), 129 Ill. App. 3d 1011, 1021, 473 N.E.2d 421, 429.) After eliminating the erroneously pleaded claims from the third-party action, it is clear the third-party action concerns the same issue raised in counts I through III of the plaintiff's action. In *Carter*, no issue was raised as to whether the case involved a single or multiple claims. *Carter* was a multiclaim and multiparty action and thus, came within Rule 304(a).

■ If a case involves a single claim, Rule 304(a) does not apply. Here, counts II and III of plaintiffs' complaint are entirely dependent on count I, for if plaintiffs have no implied easement, they are not entitled to damages from defendants. Likewise, the only claim validly raised in defendants' third-party action—indemnity for damages defendants must pay plaintiffs—is dependent on plaintiffs prevailing on count I. A claim for Rule 304(a) purposes has been defined as a matter in an action which determines the possible right of one party or the liability of the other. (*Hise*, 116 Ill. App. 3d 681, 452 N.E.2d 372.) In this case, the claim is the implied easement plaintiffs ask for in count I. The trial court determined there is no easement, hence there is no other claim in the trial court. *Carter* is not violated because there is but one claim.

■ Finding this is a single-claim case does not run afoul of Supreme Court Rule 301, which governs appeals from *final* judgments. A judgment is final for appeal purposes if it determines the litigation on the merits so that, if affirmed, the only thing remaining is to proceed with the execution of the judgment. (*People ex rel. Scott v. Silverstein* (1981), 87 Ill. 2d 167, 429 N.E.2d 483.) It has also been stated that in order to determine whether an order is "final," the substance and effect of the adjudication are determinative. (*Altschuler v. Altschuler* (1948), 399 Ill. 559, 570, 78 N.E.2d 225, 231.) "A decree *** may so completely adjudicate the rights of the parties as to constitute a final and appealable order." (*Altschuler*, 399 Ill. at 570, 78 N.E.2d at 231.) The judgment entered on March 31, 1989, was final and immediately appealable. The notice of appeal dated April 28, 1989, vested this court with jurisdiction to hear the appeal. Accordingly, we deny defendant's motion to dismiss this appeal and now consider the merits of the appeal.

The trial court found plaintiffs did not meet their burden of proof in establishing, by clear and convincing evidence, the existence of an implied easement. The trial court stated the evidence established the sandpoint water would have been convenient and beneficial but did

not rise to a level necessary for an implied easement. Specifically, since the evidence established the east tract had other sources of water, the sandpoint was not necessary for the east parcel.

■■ ■ Easements by implication relate to a prior or existing use of land by a landowner. They arise when the owner of one tract of land or of two or more adjoining parcels sells a portion and, prior thereto, one portion derived a benefit or advantage from the other portion, which benefit was of an apparent, continuous, and permanent nature. (*Granite Properties Ltd. Partnership v. Manns* (1987), 117 Ill. 2d 425, 437, 512 N.E.2d 1230, 1236.) The doctrine of implied easements is based on the principle that a conveyance of property, in the absence of an express grant, imparts all the benefits and burdens which exist at the time of the sale and is designed to give effect to the actual intent of the parties as shown by the facts and circumstances of the particular case. *Frantz v. Collins* (1961), 21 Ill. 2d 446, 449, 173 N.E.2d 437, 439.

■■ ■ The essential elements for an implied easement from a preexisting use are: (1) common ownership of the dominant and servient parcels followed by a separation of title; (2) before the separation, the common owner used part of the united parcel for the benefit of another part and this use was continuous, obvious, and permanent; and (3) the claimed easement is beneficial and necessary to the enjoyment of the parcel conveyed or retained. (*Granite*, 117 Ill. 2d at 437, 512 N.E.2d at 1236; *Sheehan v. Sagona* (1958), 13 Ill. 2d 341, 345, 148 N.E.2d 795, 797.) Plaintiffs seeking an easement by implication must establish by clear and convincing evidence that at the time of the severance of title, the easement was in existence and was intended to be permanent. (*Seiber v. Lee* (1987), 158 Ill. App. 3d 361, 369, 511 N.E.2d 1296, 1301.) On review, a court will not disturb the findings of a trial court as to proof of the conditions of an implied easement unless they are against the manifest weight of the evidence. *Seiber*, 158 Ill. App. 3d at 369, 511 N.E.2d at 1301-02.

Plaintiffs argue they sufficiently proved the three elements of an implied easement. Plaintiffs agree with defendants that easements will not be implied where the evidence established that the parties did not intend it. However, plaintiffs strenuously disagree with defendants as to when in time the parties' intent to create an implied easement must exist. Plaintiffs submit that point is when the rights and obligations of the purchasers and sellers become fixed so that neither party by unilateral action could alter or modify them. Plaintiffs rely on *Walters v. Gadde* (1945), 390 Ill. 518, 62 N.E.2d 439, *Carter v. Michel* (1949), 403 Ill. 610, 87 N.E.2d 759, and *Sheehan*, where the supreme court stated

such easements are created at the time of sale. Plaintiffs maintain that time was February 1, 1985, the day of the auction.

Defendants argue the correct point in time is when the severance of ownership occurs due to a conveyance. The first conveyance occurred in this case on March 19, 1985, and according to the defendants, the estate's expressions of intent at that time are important.

The time between the auction and the first conveyance by deed in this case is important because it was after the auction that plaintiffs and defendants first discussed the sandpoint among themselves. The issue was raised with the executors for the first time at the March 19 closing. Then, the executors stated they did not intend for an easement for plaintiffs and, therefore, defendants did not have to supply water for plaintiffs' parcel.

The supreme court cases discussing easements by implication appear to use the terms "sale" and "conveyance" interchangeably. In *Sheehan*, the supreme court stated the purchaser from a common owner of a portion of a tract of land "takes the portion sold with all the benefits and burdens which appear, *at the time of sale*, to belong to it." (Emphasis added.) (*Sheehan*, 13 Ill. 2d at 345, 148 N.E.2d at 797.) Similarly, in *Walters*, the court stated that the moment a severance occurs by sale of a part, easements are created which correspond to the benefits and burdens mutually existing at the time of the sale. (*Walters*, 390 Ill. at 521, 62 N.E.2d at 441.) Further, the court stated:

" 'The parties are presumed to contract in reference to the condition of the property at the time of the sale, and neither has a right by altering arrangements then openly existing, to change materially the relative value of the respective parts. [Citation.]' " *Walters*, 390 Ill. at 521, 62 N.E.2d at 441, quoting *Bihss v. Sabolis* (1926), 322 Ill. 350, 153 N.E. 684.

Accord *Carter*, 403 Ill. 610, 87 N.E.2d 759.

The supreme court in *Granite* stated the inference for implied easements "is drawn from the circumstances surrounding the *conveyance* alone." (Emphasis added.) (*Granite*, 117 Ill. 2d at 437, 512 N.E.2d at 1237.) The supreme court in *Granite* cited to the Restatement of Property, where the term "a conveyance" is also used. *Granite*, 117 Ill. 2d at 438, 512 N.E.2d at 1237, citing Restatement of Property §474 (1944).

"Conveyance" is defined as an instrument by which some estate or interest in land is transferred from one person to another, such as a deed, mortgage, *et cetera* (Black's Law Dictionary 301 (5th ed. 1979)). "Sale" is defined as "[a] contract between two parties ***

by which the [seller], in consideration of the payment or promise of payment of a certain price *** transfers to the [buyer] the title and the possession of property." (Black's Law Dictionary 1200 (5th ed. 1979).) In the present case, no written document appears to have been prepared after the auction and before the first conveyance by deed.

■■ We conclude plaintiffs' argument ignores the essence of implied easements. Such easements arise as an inference of the intention of parties to a conveyance of land. As noted by the supreme court in *Granite,* the inference comes about in those cases where the parties "had not thought or had not bothered to put the intention into words, or to parties who actually had formed no intention conscious to themselves." (*Granite,* 117 Ill. 2d at 437, 512 N.E.2d at 1237.) Here, the evidence established the parties engaged in several discussions after the auction and before the first conveyance on the subject of the sandpoint. Further, there is no dispute that until the conveyance on March 19, the unity of ownership for these two parcels remained with the executors, who *expressly* disavowed any intent to create an easement in plaintiffs' favor. We find plaintiffs' attempt to separate the circumstances which occurred up to the time of auction from what occurred thereafter unsupportable.

We conclude the circumstances of the entire transaction must be examined to determine the parties' intent. The evidence established that prior to February 1, 1985, the east parcel used the sandpoint for watering livestock. However, Sterling Shafer testified he installed the sandpoint as only standby water for the east side. Both he and Robert Shafer testified that when they lived in the house, there was plenty of water for the household and livestock without the sandpoint. These statements were contradicted by Helen Martin, who also lived in the house some 40 years previous to 1985 and who remembered the supply of water in the house was insufficient.

The evidence also established the sandpoint was connected by underground waterlines to two or three hydrants on the east parcel and the sandpoint pump was powered by electricity from the house on the east parcel. Other sources of water exist on the east parcel, and plaintiffs testified they do receive water from these sources for their livestock and house.

■■ The supreme court in *Granite* stated the level of "necessity" required for implied easements, where prior use supports an inference of the parties' intent, is known as reasonable necessity. As stated in the treatise, American Law of Property, quoted with approval by the *Granite* court:

" '[A] use is reasonably necessary when it is reasonably convenient to the use of the land benefited. *** The more pronounced a continuous and apparent use is, the less the degree of convenience of use necessary to the creation of an easement by implication.' " *Granite*, 117 Ill. 2d at 440-41, 512 N.E.2d at 1238, quoting 2 American Law of Property §8.43 (A.J. Casner ed.) (1952).

Plaintiffs rely on the *Frantz* case for their proposition that the sandpoint is necessary for the east parcel. There, the common grantor dug a well on the property line between his two adjoining parcels and inserted a "T" valve in order to supply water to both parcels. Later, after one parcel was sold, it was discovered the well was located entirely on defendant's parcel. Defendant in *Frantz* then disconnected the water supply from plaintiffs' parcel. The *Frantz* court affirmed the trial court's finding of an implied easement in view of the evidence of the intent of the common grantor and the fact that the plaintiffs' parcel had no alternate water supply. Thus, the use of the well by plaintiffs in *Frantz* was highly convenient, beneficial and necessary.

*Frantz* is inapposite to this case because, here, plaintiffs have an alternate source of water on the east parcel. Moreover, in *Frantz*, the common grantor's expressed intent at the time of digging the well to benefit both parcels supported the implied easement. Here, the estate's expressed intent prior to the conveyance by deed negates the existence of implied easement. This distinction between the *Frantz* case and the present case was noted by the trial court in its decision.

▮▮ There is no dispute the sandpoint benefitted the east parcel from 1950 to 1985. The trial court, however, found the evidence did not clearly and convincingly support the plaintiffs' claim the sandpoint was necessary. We believe the express statements of the executors support the nonexistence of an implied easement. The necessity evidence is closely balanced. As a reviewing court, the conclusion of the trial court will not be reversed unless it is against the manifest weight of the evidence. We conclude it was not and, therefore, affirm the trial court.

Affirmed.

KNECHT, P.J., concurs.

JUSTICE GREEN, dissenting:
Although the question of our jurisdiction is a technical one and

presents a somewhat close question, I cannot agree we have jurisdiction of this appeal. As the majority has explained, the problem arises because the circuit court entered judgment only as to count I, which sought a declaration of the existence of an easement, and did not rule (a) upon counts II and III, which sought compensatory and punitive damages respectively for a violation of the easement, or (b) upon the third-party complaint.

If we could treat the judgment of the circuit court as to count I as a judgment disposing of the other counts and the third-party complaint, we would have no problem. I am unable to construe the judgment in that way, however, as the court's order of May 24, 1989, expressly stated entering judgments on those counts was unnecessary. Thus, even assuming counts II and III would be barred under the doctrine of *res judicata*, which includes collateral estoppel, and assuming the third-party complaint was improperly joined, those counts and the third-party complaint are still pending. A judgment, though erroneously entered on any of them, might not be subject to collateral attack. The heart of my disagreement with the majority is that I do not agree we can disregard those counts and the third-party complaint because they should be dismissed.

If we deem the case to be one for a single claim, the pendency of the two counts and the third-party complaint prevents the order from which appeal is sought from being an order final as to the entire case and thus appealable pursuant to Supreme Court Rule 301 (107 Ill. 2d R. 301). The treatment given by the circuit court to count I does not meet the requirement of *Carter v. Chicago & Illinois Midland Ry. Co.* (1988), 119 Ill. 2d 296, 518 N.E.2d 1031, to be treated as a case separate from counts II and III and the third-party complaint. In order for such a situation to exist, an order of the circuit court would have to have been entered "clearly and unequivocally [stating] that the claim, counterclaim or the party [here, count I] [had] indeed been *severed* (in the narrow sense of that word) and that the severed claim, counterclaim or party shall proceed thereafter separate" from the rest of the case. (Emphasis in original.) (*Carter*, 119 Ill. 2d at 307-08, 518 N.E.2d at 1037.) No such order was entered here.

If the case is to be treated as a multiclaim case, clearly a timely finding pursuant to Supreme Court Rule 304(a) (107 Ill. 2d R. 304(a)) is necessary to make the order which was final only as to count I appealable. Plaintiffs seek to supply that requirement by the circuit court order entered on May 23, 1989, purporting to be *nunc pro tunc* as of March 31, 1989, a date less than 30 days prior to the filing of

the notice of appeal on April 28, 1989. Under Supreme Court Rule 329 (107 Ill. 2d R. 329), a trial court record may be amended to properly show the existence of an order, intended to have been entered at an earlier date, without the formalities traditionally required for entry of a *nunc pro tunc* order. However, the order, to be entered, must be one intended to be entered at the date shown on the record. (*People v. Chitwood* (1977), 67 Ill. 2d 443, 367 N.E.2d 1331; *People ex rel. Willett Motor Coach Co. v. Board of Education* (1988), 171 Ill. App. 3d 166, 524 N.E.2d 1155.) The circuit court's order of May 23, 1989, makes clear that the Rule 304(a) finding contained in that order had not been intended to be entered upon March 31, 1989, or any prior date. Rather, the May 23 order indicates the Rule 304(a) finding had not been made previously, but was designated as being entered on March 31, 1989, in an attempt to solve the existing procedural maze by giving appealability to the order dismissing count I.

In *Carter*, the supreme court was very careful to adhere to strict rules in permitting appeals in cases where some matters were left undecided. The court emphasized the necessity of discouraging piecemeal appeals. The opinion pointed out that, where uncertainty exists as to whether appeal is required at a stage where matters are left undecided, counsel will often attempt unnecessary appeals to be sure to preserve issues. The situation here is one where allowance of appeal would appear to be fair. However, the majority is creating a rule disregarding pending counts on the basis they have no merit after the decision from which appeal is sought and disregarding a pending third-party complaint on the theory it is improperly joined. Such a rule may create undue confusion.

As I deem the order from which appeal is sought failed to qualify for appeal under either Supreme Court Rule 301 or Rule 304(a), I would dismiss the appeal.